63 N.J. Super. 534 (1960)
164 A.2d 834
MARY NOBLE, PLAINTIFF,
v.
D. VAN NOSTRAND COMPANY, INC., A DELAWARE CORPORATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 28, 1960.
*536 Mr. Elmer J. Bennett argued the cause for plaintiff (Messrs. Carpenter, Bennett & Morrissey, attorneys).
Mr. Frank C. O'Brien argued the cause for defendant (Messrs. Pitney, Hardin & Ward, attorneys).
COLLESTER, J.S.C.
The plaintiff Mary Noble seeks an interlocutory injunctive order to restrain the defendant D. Van Nostrand Company, Inc., a publishing corporation, from publishing a book entitled "Your Garden in the South" written by one Hamilton Mason. Both Mary Noble and Hamilton Mason reside in Jacksonville, Florida, while the defendant's main office is located in New Jersey. Mr. Mason is not a party in this action.
Evidence for and opposed to the motion was presented by affidavits, depositions and testimony. I find the pertinent facts to be as follows.
In 1950 the plaintiff became acquainted with Hamilton Mason and thereafter a close friendship developed. Miss Noble was an established author on the subject of horticulture and gardening and had written books on the subject, several having been published by the defendant. Mr. Mason was likewise interested in the subject.
After their friendly relationship had progressed for about three years, Mr. Mason suggested that they jointly write a book on the subject of gardening in the South to which Miss Noble agreed. In December 1953 Miss Noble communicated *537 with the defendant suggesting that the latter consider publishing the book after it was written. A proposed outline and a sample chapter, jointly prepared by Miss Noble and Mr. Mason, were submitted and on December 14, 1954 a contract was entered into whereby Miss Noble and Mr. Mason were to co-author the book and the defendant would publish the same. The tentative title was "Gardening in the South."
There then commenced a period of about five years of extensive research conducted by Miss Noble and Mr. Mason in preparation for writing the book. Innumerable plants and flowers were listed and ultimately set forth in charts. Zone areas throughout the South were established where plants and flowers could be readily grown. Field trips and the study of various technical papers and reference works were undertaken, and written notes pertaining to the plants and flowers and groups thereof were prepared. All of the work undertaken was a joint effort of Miss Noble and Mr. Mason except the preparation of the written notes. In preparing the latter the work was divided up, Mr. Mason preparing the notes on tropical plants, Miss Noble on the hardy plants, and thereafter these notes were interchanged. Miss Noble testified that although the notes were prepared individually, they were the product of the joint effort in their research.
In the spring of 1958, after a conference with Mrs. Harriet Van Pelt Wilson, Garden Editor of the defendant, at Mrs. Wilson's suggestion, the proposed title to the book was changed to "Your Garden in the South."
In 1958 personal differences arose between Miss Noble and Mr. Mason which steadily grew worse. In January 1959 plaintiff wrote a personal letter to Mrs. Wilson advising her of her problem and her inability to collaborate further with Mr. Mason. Mrs. Wilson replied recommending that she write seeking a release of defendant's contract and suggesting that she write a book alone on the subject of camellias. In early March 1959 the plaintiff met Mrs. Wilson in New York *538 and stated that she intended to continue her collaboration with Mr. Mason.
On March 18, 1959 the plaintiff and Mr. Mason came to a parting of the ways and to an end of the collaboration. Plaintiff sought and subsequently obtained a release of their contract with the defendant.
After the end of the collaboration Mr. Mason contacted Mrs. Wilson relative to writing a book on his own on the subject of tropical plants stating he desired to salvage something from the "individual work" completed thus far. He was advised of defendant's interest but informed that the material would have to be "rigidly his own." After further conferences with Mrs. Wilson it was agreed that he would write his own book on southern gardening using the title "Your Garden in the South" which had been originally chosen by Mrs. Wilson for the proposed book by Miss Noble and Mr. Mason. A contract was entered into on June 12, 1959.
When plaintiff learned of this venture in August, 1959 she objected to defendant's publishing Mr. Mason's proposed book. She contended that it necessarily would be based upon their joint research. She indicated that both she and Mr. Mason had drawn upon the joint material for their individual newspaper and magazine articles, but she definitely opposed his proposed publication in a book form.
In November 1959 plaintiff's father, a Florida attorney, communicated with defendant on the plaintiff's behalf and was advised by defendant's president that he understood Mr. Mason's book was not the direct outgrowth of a collaboration but was an original work. Mr. Noble thereupon wrote defendant as follows:
"Since your letter states that it was your understanding that the material is wholly original, we shall have to wait until publication to compare the book as published with the original work done by the two of them."
Thereafter upon the submission of Mr. Mason's manuscript, the defendant proceeded with its plans to publish the *539 book. Various advertising ventures were undertaken; circulars were mailed to various book distributors; the book was listed in the defendant's catalogue indicating it would be available in October 1960 and other expenses were incurred in the preparation of the book itself. Over $10,000.00 has already been expended by the defendant and many advance sales have already been effected.
The evidence presented shows that the written text prepared by Mr. Mason, now in page proof form, was entirely the language and creation of Mr. Mason. Only one chapter on the subject of bulbs had been prepared for the proposed Noble-Mason venture, and it is undenied that Mr. Mason's writing on this subject is completely different. The outline of chapters contained in the Mason book differs from that of the proposed joint venture. The zone areas contained in Mr. Mason's book differ from the zone areas originally planned for the joint venture. The charts in Mr. Mason's book differ from the original charts by wording and arrangement although covering a great deal of the basic material contained in the joint project charts.
The evidence shows that Mr. Mason wrote his book in approximately a five-month period. While he was probably able within such period to research certain material contained in his book and to prepare the manuscript, the conclusion is inescapable that in writing his book Mr. Mason drew upon the material which had been part of the joint venture with Miss Noble. Certainly he drew upon the material he had individually and jointly researched with Miss Noble, and it is doubtful that he did not also draw upon some of the material assembled by the plaintiff. To eradicate from his mind information obtained through the joint study Mr. Mason conducted with Miss Noble is incredulous. It would involve a brainwashing which is undoubtedly impossible.
Plaintiff contends that if Mr. Mason's book is published her professional reputation and earning power will suffer irreparable damage and an action for an accounting for royalties would not properly compensate her. She contends *540 that Mr. Mason could not have written his book without drawing upon the information contained in their joint research and that he should be restrained from such use. She further claims that the defendant conspired with Mr. Mason to induce him to write the book knowing he would use material jointly researched with her and having done so the defendant comes into this court with unclean hands.
The defendant denies the alleged conspiracy asserting that in dealings with Mr. Mason he was instructed that the material contained in his book must be rigidly his own. The defendant contends that the evidence clearly shows that Mr. Mason's book was not based on any writings of Miss Noble, and that plaintiff has no right to restrain Mr. Mason from using their joint research data. It is further contended that both Miss Noble and Mr. Mason used their joint research material for their individual newspaper articles, magazine articles and lectures without objection and with implied consent to do so. The defendant contends that by using the joint material for her own newspaper and magazine articles, the plaintiff comes into this court with unclean hands when she objects to publication by the defendant of Mr. Mason's book. Finally the defendant asserts that the plaintiff is guilty of laches, since, although she knew defendant was going to publish Mr. Mason's book in August 1959, she did not institute this injunctive proceeding until August 1960, after defendant had expended several thousands of dollars and now has the book printed in page proof form.
It is well established that an interlocutory injunction should not issue if the plaintiff's asserted rights are not clear as a matter of law. Citizens Coach Co. v. Camden Horse R. Co., 29 N.J. Eq. 299 (E. & A. 1878); Coles v. City of Newark, 95 N.J. Eq. 73, 76 (Ch. 1923), affirmed 95 N.J. Eq. 775 (E. & A. 1923); General Electric Co. v. Gem Vacuum Stores, 36 N.J. Super. 234 (App. Div. 1955).
In the instant case it is undisputed that we are not concerned with the piracy of literary property owned by the plaintiff in the form of an unpublished manuscript. It is *541 clear that plaintiff and Hamilton Mason jointly undertook an extensive research of the subject of plants and flowers and their growth in certain areas throughout the South. It was the compilation of data in preparation for the joint writing of a book on the subject  a book which was never written.
There is no question but that both the plaintiff and Mr. Mason jointly owned the research data. Does such a joint ownership give to either the plaintiff or Mr. Mason the right to bar each other from using the product of their joint efforts?
The facts presented to this court apparently constitute a case of novel impression. Neither the research of counsel nor of this court has produced a judicial decision which squarely meets the issue presented. This being so it has been necessary to review the history and judicial decisions relating to the subject of co-authors and their respective rights as developed in the law of copyrights.
The English doctrine concerning the rights between co-owners of a literary work is that no co-owner may exploit his interest, either through use or license, without the consent of the other. Powell v. Head, 12 Ch. D. 686 (1879); Cescinsky v. George Routledge & Sons, Ltd., 2 K.B. 325 (1916).
An early American attempt to settle the problems of the rights of one co-owner against another was the case of Carter v. Bailey, 64 Me. 458 (Sup. Jud. Ct. 1874). There the court held that the defendant could reproduce a copyrighted book himself, without the consent of the other co-owners and without accounting for profits. It reasoned that giving a veto power to one co-owner could both destroy the value of the copyright to the others and prevent free publication, while a requirement to account would either cause disuse of the copyright or allow a division of profits where there was no obligation to share losses. Thus, the court seems to have been primarily concerned with encouraging publication of existing artistic works, even at the expense of promoting *542 competition among co-owners. See 72 Harv. L. Rev. 1556 (June, 1959).
The modern American cases have rejected both the Carter doctrine and the English rule. Instead courts seem to have developed a middle path which sustains the power of one co-owner to use or license the entire work without the consent of the others, Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266 (2 Cir. 1944); Nillson v. Lawrence, 148 App. Div. 678, 133 N.Y.S. 293 (App. Div. 1912), but requires an accounting for profits from such exploitation. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2 Cir. 1955), modified 223 F.2d 252 (2 Cir. 1955) ("12th Street Rag" case); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 73 F. Supp. 165 (D.C.S.D.N.Y. 1947) ("Melancholy Baby" case); Crosney v. Edward Small Productions, Inc., 52 F. Supp. 559 (D.C.S.D.N.Y. 1942); Jerry Vogel Music Co. v. Miller Music, Inc., 272 App. Div. 571, 74 N.Y.S.2d 425 (App. Div. 1947), affirmed 299 N.Y. 782, 87 N.E.2d 681 (Ct. App. 1949). See also Brown v. Republic Productions, Inc., 156 P.2d 40 (Cal. Ct. App.), affirmed 26 Cal.2d 867, 161 P.2d 796 (1945).
In Maurel v. Smith, 220 F. 195 (D.C.S.D.N.Y. 1915), affirmed 271 F. 211 (2 Cir. 1921) and more recently in the "12th Street Rag" case  Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, modified 223 F.2d 252 (2 Cir. 1955), courts have followed the doctrine that when one co-owner secures a copyright or renewal thereof in his name alone he holds it as "constructive trustee" for the others with a duty to account for the profits.
This rule bears close resemblance to the principles governing tenants in common. Unlike the English veto doctrine, it achieves its goal of protecting the interests of co-owners without employing a means unduly restrictive of publication; unlike Carter, supra, it encourages a studied choice of the most effective media for exploitation by eliminating the haphazard race for first publication which the fear of depletion precipitates. 72 Harv. L. Rev. 1559 (1959).
*543 All authorities seem to agree that co-ownership in a copyright is a tenancy in common. Howell, The Copyright Law 51 (1942); Weil, Law of Copyright 253 (1917); 48 Colum. L. Rev. 423 (1948); 72 Harv. L. Rev. 1554 (1959), and courts in dealing with the rights of co-owners in copyright cases have relied largely on general principles governing tenancies in common. See Nillson v. Lawrence, 148 App. Div. 678, 133 N.Y.S. 293 (App. Div. 1912); Klein v. Beach, 232 F. 240 (D.C.S.D.N.Y. 1916), affirmed 239 F. 108 (2 Cir. 1917); Crosney v. Edward Small Productions, 52 F. Supp. 559 (D.C.S.D.N.Y. 1942); Brown v. Republic Productions, Inc., 156 P.2d 40 (Cal. Ct. App. 1945).
It is noteworthy that in such cases involving literary property the courts have steadfastly restricted the remedy of a co-owner to an accounting and have denied applications for injunctive relief.
In Nillson v. Lawrence, supra, the owner of an undivided half interest in a play and the manuscript thereof sought an injunction and an accounting against the defendants from producing the play, which they had been doing. The court stated, at p. 295 of 133 N.Y.S.:
"It is settled that, with regard to property of this nature, one tenant in common has as good a right to use it, or to license third persons to use it, as has the other tenant in common, and neither can come into a court of equity and assert a superior right, unless it has been created by some contract modifying the rights which belong to the tenants in common as such."
The application for injunction was denied.
In Klein v. Beach et al., supra, the executor of the estate of Charles Klein, a playwright, brought suit for an injunction and an accounting against Rex Beach, an author, and the Selig Polyscope Co., a motion picture producer. Under a contract Klein wrote a dramatic version of Beach's novel "The Ne'er Do Well" for presentation on the stage. Under the agreement the resulting play reverted to Klein and Beach *544 after the theatrical production ended. Beach contracted with Selig Co. whereby the latter agreed to produce motion pictures of the novel and Klein sought injunctive relief and an accounting. The court said, at page 247 of 232 F.:
"Here both Beach and Klein became the owners of Klein's drama, and each could then do with it what he pleased, with the duty of accounting over. Beach could license Klein's dramatic version for the screen and Klein could do the same thing; and, of course, they each could license others to produce the Klein play on the stage. But in all these instances one would be obliged to account to the other."
The court denied injunctive relief and retained only Klein's right to secure an accounting from Beach.
In Brown v. Republic Productions, Inc., 156 P.2d 40 (Cal. Ct. App. 1945), affirmed 26 Cal.2d 867, 161 P.2d 796 (Sup. Ct. 1945), the plaintiff was a joint author of a musical composition with the defendants, Styne and Meyer. Before the composition had been published Styne and Meyer, without Brown's consent, rewrote and altered the lyrics and music of the original composition for a motion picture to be produced by the defendant Republic Productions, Inc. In the suit plaintiff was awarded a judgment against Styne and Meyer for an accounting to him of one-third of the profits received, but was denied judgment against Republic Productions, Inc. On appeal, the District Court of Appeal stated (at 156 P.2d 41):
"Inasmuch as appellant [Brown] and defendants Styne and Meyer were owners in common of the property of the musical and lyrical compositions, the latter were severally entitled to use the compositions and to license others to use them without first consulting appellant with reference to such use or license, [citing cases]. * * *
"By lease or license one tenant in common may confer upon a stranger the right to occupy and use the property of the cotenants to the same extent that the licensor himself might have used it. Lee Chuck v. Quan Wo Chong and Co., supra [91 Cal. 593, 598, 28 P. 45]. Such licensor's sole obligation is to account to his cotenants. Neither can exercise a superior authority. Herbert v. Fields, supra [152 N.Y.S. 487]."
*545 In Herbert v. Fields, 152 N.Y. Supp. 487 (Sup. Ct. 1915), Victor Herbert sought an injunction against Lew Fields, Lee Shubert and others from producing a motion picture, "Old Dutch." While the facts are distinguished from the case, sub judice, the court stated, at page 489:
"If plaintiff's claim that the work must be treated as a whole be accepted, it is difficult to escape the application of the principle that plaintiff alone cannot restrain a production of the work by third parties, without proof that they have not been licensed by his co-owners."
In summary, it may be stated that generally with respect to the problems of co-owners of literary or creative productions in the copyright field, courts have held (1) such co-owners are tenants in common, (2) one co-owner may use or license the use of the production without the consent of the other, being liable only for a duty to account for profits, (3) the tendency of the courts is to oppose judicial action which discourages collaboration in literary or creative productions or restricts or bars the publication of creative works, (4) neither co-owner occupies a superior right in a literary or creative work, and (5) an injunction or action for accounting will not lie against the licensee of one co-owner by the other.
In the case, sub judice, as has already been noted, Miss Noble and Hamilton Mason did not complete a manuscript based upon their joint research. In the decisions above set forth the actions were based on completed literary or artistic compositions and it would be assumed that a co-author of a completed work would be in a stronger position to secure injunctive relief than one in the position of the instant plaintiff. It is apparent however that in the copyright field, and it may be added in patent law as well, the remedy afforded by the courts is one of an accounting against the co-owner and injunctive relief is denied.
It is my opinion that the plaintiff and Mr. Mason own the compilation of research data as tenants in common *546 and that neither has a superior right over the other. I am of the opinion that each co-owner can use the same without the consent of the other.
If the plaintiff has a remedy, it would seem to be in an action for accounting against Mr. Mason, who is not a party to this suit. Nor do I infer by this statement that the plaintiff is entitled to maintain such an action.
It is my opinion that the plaintiff does not have a right to injunctive relief against the defendant, D. Van Nostrand Company, Inc.
While the foregoing disposes of the primary issue before this court, I believe it proper to pass upon the other issues raised.
The plaintiff contends that the defendant conspired with Mr. Mason to have the latter write a book based upon their joint work product and that as a result the defendant stands before this court with unclean hands. I am satisfied that no such conspiracy occurred and that, if anything, the defendant continually insisted that the book must be Mr. Mason's own original creation.
The plaintiff further contends that if Mr. Mason's book is published her professional reputation and earning power will suffer irreparable damage. I see no basis for such a contention. If she has a right to an accounting against Mr. Mason for a share of the royalties she will be entitled to recover monetary damages.
An additional factor which should be the subject of comment is the defendant's contention that no agreement existed between Miss Noble and Mr. Mason that neither could use the joint material without the other's consent. In fact consent to such use is implied by the admitted use by both Miss Noble and Mr. Mason in the preparation of their individual newspaper and magazine articles on the subject involved. See Nillson v. Lawrence, supra.
And finally, I am of the opinion that the plaintiff is guilty of laches. She learned in August 1959 that the defendant was under contract to publish Mr. Mason's book. *547 Her father, who was her attorney, after communicating with the defendant in December 1959 informed the defendant that they would wait until publication to compare the book as published with the original work done by Miss Noble and Mr. Mason. The plaintiff knew, or had every reason to know, that thereafter a substantial amount of money was being expended by the defendant for the publication and promotion of Mr. Mason's book. She took no legal steps against Mr. Mason in Florida. She waited until August 1960 before bringing her action against the defendant.
In Nazare v. Board of Embalmers, 4 N.J. Super. 567 (Ch. 1949) this court stated:
"It is elementary that one who seeks the drastic remedy of injunction must not only present a clear case entitling him to relief but he must move with dispatch to secure it."
See also Marini v. Borough of Wanaque, 37 N.J. Super. 32, 41 (App. Div. 1955).
For the reasons hereinabove set forth it is the decision of this court that plaintiff's application for an interlocutory injunctive order be denied and the restraint hereinbefore entered is dissolved.